Alice A. Richheimer, Plaintiff-Appellee, Cross-Appellant, v. Robert C. Richheimer, Defendant-Appellant, Cross-Appellee.
Irving Goodman and Arthur Morse, Cross-Appellants.

Gen. No. 49,460.

First District, Third Division.

May 13, 1965.

Rehearing denied June 3, 1965.

Davis, Boyden, Jones & Baer, of Chicago (Benjamin B. Davis, Joseph Winslow Baer, and Phillip M. Citrin, of counsel), for appellant.

Irving Goodman, pro se, appellee and cross-appellant; Arthur Morse, Irving S. Friedman and Aaron H. Cohn, of Chicago, for plaintiff-appellee and cross-appellant, Arthur Morse.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from a decree entered in an uncontested suit for separate maintenance. Defendant charges that the alimony and attorneys' fees awarded were excessive. Plaintiff has cross-appealed, charging that the alimony and child support were inadequate. Two of her attorneys have filed cross-appeals, claiming that their fees were inadequate. Defendant filed a motion to dismiss the attorneys' cross-appeals, which motion was taken with the case. The principal issues on appeal are the amount of the defendant's income and what would be a fair portion thereof as alimony; the standing of the attorneys to file cross-appeals; and the proper amount to be awarded for attorneys' fees.

The Richheimers were married in 1933 and lived together until August 1960. They have three children—an adult son, Robert, and two minor daughters Laurie and Kathie, who were seventeen and thirteen in December 1963 at the time of the decree. Kathie is afflicted with cerebral palsy and requires special care and attention. Defendant is the president and one of the three directors of Richheimer Coffee Company (Richheimer), a wholesale coffee business. The preferred stock and half of the common stock of the company is held by a testamentary trust established by defendant's father for the benefit of his mother during her lifetime. Defendant and his brother each own one-quarter of the common stock and are the residual beneficiaries of the testamentary trust. Dividends

were paid on the common stock in 1957, 1958, 1960 and 1961, but not in 1962. No common stock dividends were paid before 1957. Defendant and his brother also each own fifty percent of the stock of the Thayse Coffee Company (Thayse) which is engaged in the wholesale coffee business as a selling agent. Thayse has the same address as Richheimer and buys coffee from the latter. Defendant testified that Richheimer sold coffee to Thayse at a profit. He testified that his original investment in Thayse was $500 and that its net assets at the end of March 1962 were $64,466.24.

Defendant received approximately $43,500 in salary from Richheimer and $2,500 from Thayse in 1962, the year prior to the entry of the decree. In 1962, defendant's total taxable income was $54,885.30, including a taxable, nonrecurring capital gain of about $4,500 and a bonus of about $5,000, based on ten percent of the profits of Richheimer, provided such sum does not exceed $5,000.

In December 1963, at the time of the entry of the decree for separate maintenance, defendant had an interest in the Richheimer employees' pension fund computed to be $74,028, which cannot be withdrawn until 1975 when he reaches the age of sixty-five. He also had $5,000 in bonds plus approximately $20,000 in cash. His only other asset was the home in Glencoe worth approximately $50,000, where the plaintiff and their two daughters live. He formerly owned a 34-foot sail boat or yacht costing $25,000 and belonged to a yacht club, but sold the yacht in 1962. The family usually took a month's cruise during the summer and also took other trips and vacations and generally lived in the manner of a well-to-do family.

Plaintiff is a sculptress and in 1962 she earned $1,800 on a single commission. There is no evidence to indicate that she had earnings of any regularity from such source.

357

The complaint for separate maintenance and other relief was filed on October 11, 1960. The cause was referred to a master, who found among other things that temporary alimony and child support of $1,700 a month was fair and reasonable. It was conditioned on the defendant's payment of Kathie's medical expenses, Robert's college expenses, the payment of insurance premiums, and the payment of real estate taxes on the house. During the period prior to the entry of the decree, extended and intensive negotiations were conducted regarding a divorce and property settlement, the cause being continued from time to time. In about September 1962 plaintiff refused an offer of settlement. In June 1963 a stipulation was entered into and pursuant thereto, a hearing on plaintiff's complaint for separate maintenance was had before the chancellor. There was no contest on the merits, and the testimony was limited to the amount of the defendant's income and the amount to be awarded for the support of plaintiff and their children.

The decree ordered the defendant to provide the following:

1.  Alimony of $15,500 annually;
2.  Child support of $6,000 annually ($2,400 for Laurie and $3,600 for Kathie) tax free;
3.  Rent-free use of the Glencoe home, the reasonable rental value of which was $6,000 a year;
4.  Real estate taxes on the home, which now exceed $1,000 annually; and
5.  To carry life insurance and pay the premiums thereon of $2,500 a year for the benefit of the three children.

The total benefits in cash and kind amounted to over $31,000 annually. In addition, defendant was to put the home in good repair and was to provide plaintiff

358

with a new 1964 automobile suitable for carrying the daughter, Kathie, and a wheelchair.

The custody, control and education of the children was awarded the plaintiff, with reasonable visitation rights for the defendant.

██ ██ It is well settled that in determining the amount of alimony to be allowed, the court shall take into consideration the condition in life of the parties, the place of residence of the wife or husband, and the circumstances of the respective parties. Ill Rev Stats c 68, § 22 (1963). The wife is entitled to be maintained and supported in a manner consistent with her station in life and the husband's ability, if the money required therefor be not more than a just and equitable proportion of the joint income of herself and her husband. Harding v. Harding, 144 Ill 588, 32 NE 206.

Plaintiff in her cross-appeal contends that the award is not adequate; that the defendant's income is potentially much greater than the $55,000 a year found by the chancellor; that the defendant and his brother control Richheimer and the amount of its distributable dividends and its pension fund, and that it is reasonable to suppose that if the defendant ever rids himself of his wife, additional income would be forthcoming to him in the form of dividends and withholdings from the pension fund. The plaintiff suggested one of the three following methods for determining defendant's income: (1) to an estimated salary of $48,000 from Richheimer and $2,500 from Thayse, there be added $10,000 from defendant's profit-sharing contributions and earnings on interest and $3,000 in usual dividends, for a total salary of $63,500; or (2) to the income of $63,500 shown in method (1) there be added $16,500, defendant's pro rata share of $79,931, the corporate earnings of Richheimer after giving effect to preferred and common dividends, and $8,800, the

pro rata share of the $17,600 corporate earnings of Thayse, for total earnings of $88,800; or (3) that Richheimer and Thayse be considered partnerships instead of corporations, and that defendant's share of the income be computed on the basis of their total earnings. This would include all of method (1) except the $3,000 in dividends, plus $38,850.30, defendant's pro rata share of $148,247.66 pre-tax earnings of Richheimer after giving effect to $7\frac{1}{2}\%$ interest in the preferred stock and $12,511.73, defendant's pro rata share of $25,023.46 pre-tax earnings of Thayse, for total earnings of $111,862.03.

In all the testimony before the master and chancellor there was nothing to prove or indicate that the brothers had entered into a conspiracy to minimize the defendant's income during his marital difficulties. Richard, defendant's brother, was not called to testify. Both the master and chancellor indicated that the defendant testified fully and frankly at the hearings and that he and his counsel complied fully with all requests for documents pertaining to his personal income and to the corporate incomes of Richheimer and Thayse. These documents reveal that there was no unusual disruption of earnings in either corporation during defendant's marital difficulties. Defendant's interest in the Richheimer pension plan did not give him any spendable income, since the plan was initiated to provide future security for the Richheimer family.

Plaintiff, evidently for the purpose of discrediting defendant generally, calls attention to the amendment of a stockholders' "buy and sell" agreement. This was executed in 1961 during the pendency of this litigation. As we understand it, it undertook to fix the price to be paid for the stock, under circumstances therein prescribed, by one party to the other or the other's estate. This was fixed at book value plus a sum determined by a formula there stated. But it also apparent-

ly undertook to fix the price to a purchaser at a judicial sale, which plaintiff contends could operate to her disadvantage. This agreement was never admitted in evidence. It is explained by defendant as having to do with the possibility of a stranger getting possession of the stock at a judicial or bankruptcy sale. Whether this be true or not is of little relevance to the issue before us. We have no doubt that in this bitter struggle there was little good will between the parties.

Plaintiff also argues that under a settlement agreement worked out in contemplation of divorce prior to entry of the separate maintenance decree, defendant was willing to give her more than the amount awarded her by the decree here in question. This is contested by defendant, but there is no need to go into it as the decree before us must stand on its own merits.

The chancellor's finding that the income of the defendant was $55,000 a year was fully supported by the evidence. We cannot say that the distribution of profits by way of dividends and earnings was based on anything more than sound tax and business considerations.

Defendant argues that plaintiff received more than a just and equitable portion of the joint income as alimony. Except for the small income which plaintiff had as a sculptress, the income was entirely the defendant's.

There is no serious argument over the provisions made for the two minor children. Defendant made it clear at the hearings and on oral argument that he wished to provide for both children, including medical expenses for Kathie. Based on a gross income of $50,500 (the extra $4,500 found by the chancellor approximates a nonrecurring capital gain), defendant's net income after taxes is $37,446. Minus his cash decretal obligations of alimony, child support, insurance premiums and real estate taxes, this leaves

defendant $12,405 in net spendable income. By the terms of the decree, defendant was required to provide plaintiff with annual benefits in cash and kind of over $31,000. The alimony was taxable to plaintiff as income, and after the payment of such tax (about $3,500) as the head of a household, plaintiff and the children would have about $27,500. The decree thus gives plaintiff and the children well over two dollars for every dollar available to defendant. Of the amount so awarded, we are of the opinion that the allotment to the children is fair, but the alimony allowance of $15,500 is excessive.

In Olin v. Olin, 347 Ill App 177, 106 NE2d 158, (abst opinion), a case strikingly similar to the one at bar, the trial court awarded the wife $24,000 a year after she had proved needs of $36,000, and the appellate court reduced that amount to $14,400 in temporary alimony and child support. In both cases, the parties were married many years, had two minor children at the time of the hearings, and lived at a well-to-do level. The Olins spent considerably more, $65,000 to $70,000 annually. In both cases the husbands owned approximately 25% of family owned and controlled corporations and participated in pension funds. Olin charged certain trips and much of his entertainment expense to the corporation. His automobile was owned and maintained by the corporation. While defendant in the instant case received some similar business expenses, there is no showing that they were a matter of any substance. In 1949, the year immediately prior to commencement of the Olin litigation, Olin had gross earnings of $63,294. During 1950, the year in which litigation proceeded, his income was $68,494. While the cases in this area are legion and each must be decided on its own facts, we think the decision in the Olin case is a fair approximation and can serve as a useful guide. In that case, both the income of

the father and the standard of living of the family were many thousands of dollars higher than in the Richheimer situation.

In the instant case, plaintiff also has benefits in cash and kind aside from alimony and child support payments which, as hereinbefore listed, include the home having a rental value of $500 a month, the husband's keeping the home in repair and paying real estate taxes of over $1,000 a year, paying insurance premiums of $2,500 a year for the benefit of the children, and buying a 1964 automobile suitable for the transportation of Kathie. These are items for the benefit of the children as well as the plaintiff, but they deserve consideration as items which contribute to the plaintiff's welfare. Taking all factors into account, we have concluded that the alimony and support for plaintiff should be reduced from $15,500 to $11,500 a year.

We turn now to consideration of the attorneys' fees. Plaintiff was represented by Peter Chamales before institution of the suit. He is not a party to this suit, and no question is raised with respect to his fees. Plaintiff paid Chamales $1,500 and terminated his services on April 7, 1960. Irving Goodman was retained eight days later. He filed the instant suit and is the only lawyer in the matter who produced time sheets and who has been in the case since its commencement. Samuel A. Rinella entered his appearance as co-counsel on October 17, 1960. Rinella and Goodman worked together at hearings before the master on the plaintiff's petition for temporary alimony and child support. After the master's hearings the case was continued from time to time as intensive settlement negotiations continued without success. On November 29, 1962, two years and ten months after Goodman was retained, an order was entered substituting Arthur Morse for Rinella. The plaintiff and Morse both insisted that Goodman remain in the case.

At a hearing limited to attorneys' fees after the entry of the decree for separate maintenance, Goodman, Rinella and Morse all testified as to the services they had performed, and other attorneys testified as to the value of such services. The total attorneys' fees paid by plaintiff and awarded by the chancellor on the hearing for temporary alimony and on the hearing for permanent alimony amounted to $26,500. Chamales received $1,500, and Rinella and Goodman each received $1,000 from the plaintiff. Rinella was awarded $1,200, and Goodman was awarded $1,800 (paid by the defendant) by the chancellor at the hearing on temporary alimony. The order here appealed from awarded Morse $7,500, Rinella $5,596, and Goodman $7,200. The order of the chancellor was so apportioned as to give Goodman a total fee of $10,000, Rinella $7,500, and Morse $7,500. Goodman and Morse have filed cross-appeals, claiming that the attorneys' fees were inadequate. Rinella has not appealed.

■ Defendant filed a motion to dismiss the cross-appeals of Goodman and Morse on the ground that plaintiff did not cross-appeal from the award of attorneys' fees, but only from the alimony and child support provisions of the separate maintenance decree, and that since the cross-appellants were not parties to the suit below, they have no independent standing to seek personal relief on appeal. In a separate maintenance suit, the statute provides that "the court . . . may make such allowance of temporary attorney's fees, and suit money as may appear just and equitable as in cases of divorce." Ill Rev Stats c 68, § 22 (1963). This provision is for the wife so that she may be able to present her cause to the court. Since she cannot bind her husband to pay her counsel, she may be unable to prosecute her suit without the assistance of the court. Hence, if her complaint shows a meritorious cause of action and there is a showing of good faith

on her part, the court will extend its aid. Harding v. Harding, 144 Ill 588, 32 NE 206; Anderson v. Steger, 173 Ill 112, 50 NE 665. Borin v. Borin, 343 Ill App 649, 100 NE2d 333 (abst opinion), on which defendant relies, is one of a long line of Illinois cases which provides that orders for the payment of fees in a divorce case cannot be made after a motion to dismiss the case has been or should have been granted the plaintiff. Watson v. Watson, 335 Ill App 637, 82 NE2d 671; Labanauskas v. Labanauskas, 228 Ill App 273; Anderson v. Steger, 173 Ill 112, 50 NE 665; Mayer v. Mayer, 320 Ill App 588, 51 NE2d 804. That is not the situation in the instant case.

██ There appears to be no precedent on the precise question here involved, but in Joseph v. Joseph, 336 Ill App 258, 83 NE2d 600, an attorney was allowed an appeal from an order deleting from a divorce decree a provision for the payment of attorney's fees. The divorce act provides that in all suits for divorce in which the court grants attorneys' fees to the wife in the prosecution of the suit, such fees may in the discretion of the court be made payable in whole or in part to the attorneys entitled thereto, and judgment may be entered and execution levied accordingly. Ill Rev Stats c 40, § 16 (1963). We are of the opinion that this gives attorneys in this type of litigation a sufficient interest on which to base an appeal.

██ We turn to the question of fees. It has been the rule in this state for many years that courts will not be bound by the opinion of attorneys as to what constitutes reasonable attorneys' fees. The courts may use the knowledge they have acquired in the discharge of professional duties as to the value of legal services rendered. Golstein v. Handley, 390 Ill 118, 60 NE2d 851; Stritar v. Stritar, 48 Ill App2d 332, 199 NE2d 274. While the chancellor in taxing fees in separate

365

maintenance suits should have the opinion of other lawyers and should hear the evidence, he should also use his own judgment, having the requisite skill and knowledge to form some idea of what is reasonable compensation. Ribergaard v. Ribergaard, 349 Ill App 99, 110 NE2d 89.

■ Goodman testified at great length as to the type of services he performed, and his time sheets showed that he spent over 800 hours on the case. It is clear from that record that it was he who in the main collected the information and did the legal research. Goodman contends he is entitled to more, but in our opinion, the award of $10,000 by the chancellor was adequate.

■ The trial court awarded a total of $15,000 to Rinella and Morse. Morse did not produce time sheets. Rinella testified that it was his practice to keep them but that he had not recorded all the hours and time he had devoted to this litigation. They both estimated the value of their services. Rinella said he would not have hesitated to ask for $35,000 for himself and Goodman. Morse estimated that his services were worth $10,000 based on over 500 hours of work, but he produced no time sheets. Examination of Goodman's testimony concerning his time sheets shows that Rinella put in a great deal of time and effort not only at the preliminary hearings when he conducted much of the examination of the witnesses, but also in the extended negotiations for divorce and property settlement, which plaintiff rejected. Morse came into the litigation after the negotiations for settlement had collapsed, and he handled the case with Goodman through to the decree for separate maintenance. While it is true that in order to familiarize himself with all that had gone before, Morse had to study the record, we cannot see on what theory the defendant should be obligated to subsidize the plaintiff's zest for an ac-

cumulation of legal talent. At the hearings before the chancellor, Morse attempted to prove a new theory of defendant's income, but was not successful. Both the master and the chancellor stated that defendant and his counsel had cooperated fully in the presentation of data concerning the defendant's income and the income of the Richheimer and Thayse corporations. It is our opinion that a fee of $6,000 to Rinella and $4,000 to Morse is adequate.

The motion to dismiss the cross-appeals is denied. The decree is reversed and the cause is remanded with directions to reduce the alimony payments to plaintiff from $15,500 to $11,500 a year, and to modify the order of February 3, 1964, with respect to attorneys' fees by reducing Rinella's total fee from $7500 to $6000 and Morse's total fee from $7500 to $4000, and for such other and further proceedings as are not inconsistent with the views hereinbefore expressed.

Decree reversed and cause remanded with directions.

DEMPSEY, P. J., and SULLIVAN, J., concur.